UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| NICOLE DAVIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-CV-1118 |
| | ) | |
| PEORIA COUNTY, et al., | ) | |
| Defendants | ) | |

**DEFENDANTS CARGILL, DEARING, DUBOIS AND TROWBRIDGE'S
MOTION FOR SUMMARY JUDGMENT**

NOW COME the Defendants, BARBARA CARGILL, STEVEN DEARING, CLINTON

DUBOIS and LESTER TROWBRIDGE, Peoria County Correctional Officers, by their

attorneys, KEVIN W. LYONS, State's Attorney of Peoria County, MELINDA L. MANNLEIN,

Assistant State's Attorney, and pursuant to FRCP 56(b), move the Court for summary judgment

in their favor. In support of said motion, the Defendants state as follows:

**I.     INTRODUCTION**

On or around May 23, 2008, Plaintiff, NICOLE DAVIS, filed her 42 U.S.C § 1983

Complaint against Defendants, PEORIA COUNTY ("County"), Peoria County Sheriff

MICHAEL MCCOY ("Sheriff McCoy"), in his official capacity, and Peoria County Correctional

Officers, BARBARA CARGILL ("Cargill"), STEVEN DEARING ("Dearing"), CLINTON

DUBOIS ("Dubois"), and LESTER TROWBRIDGE ("Trowbridge"), alleging that they violated

her Constitutional rights and the Illinois Hate Crime Act.

Defendants Cargill, Dearing, DuBois and Trowbridge move for Summary Judgment on

the three counts alleged against them in Plaintiff's Complaint. Count I alleges that Cargill and

Dearing used excessive force in removing Plaintiff's jewelry while she was being held in a detox

cell as a pretrial detainee at the Peoria County Jail. Count II alleges that DuBois and Trowbridge

were present and failed to intervene during the alleged use of excessive force. Count III claims that in their alleged use of excessive force, Cargill and Dearing committed a battery against Plaintiff that was motivated by racial animus in violation of the Illinois Hate Crimes Act.

Pursuant to the Court's February 17, 2009 Order, dispositive motions are due by May 29, 2009. Defendants Cargill, Dearing, DuBois and Trowbridge respectfully pray that the Court grant them summary judgment as to all pending claims. The Court should find that summary judgment is appropriate on five separate grounds: (1) Plaintiff sustained only *de minimis* injuries as a result of the alleged use of force against her; (2) Plaintiff cannot make a *prima facie* case for use of excessive force; (3) Plaintiff cannot make a *prima facie* case for failure to protect Plaintiff from the use of excessive force; (4) even if the Court finds that Plaintiff has made a *prima facie* case for the use of excessive force and/or failure to protect against its use, each Correctional Officer is entitled to qualified immunity; and (5) Plaintiff cannot make a *prima facie* case for an Illinois Hate Crime. Therefore, Defendants respectfully pray the Court grant summary judgment in favor of each of them and against Plaintiff.

## II.    MATERIAL FACTS CLAIMED TO BE UNDISPUTED

1. On January 20, 2008, Plaintiff was spending time with her boyfriend, Brent Ward ("Ward") at Ward's apartment. (Exhibit A: Plaintiff's Deposition Transcript ("Exh. A"), pp. 14-16).

2. Plaintiff and Ward were drinking, watching TV and hanging out. (Exh. A, p. 16).

3. Plaintiff drank approximately four beers. (Exh. A, p. 16).

4. When another woman called Ward's phone, Plaintiff and Ward got into an argument over Ward's infidelity. (Exh. A, pp. 16-17; Exhibit I: Ward's Deposition Transcript ("Exh. I"), pp. 13-15, 18)

5. At some point, Ward's phone was broken. (Exh. A, p. 44)

6. Ward grabbed Plaintiff's keys and would not let Plaintiff leave the apartment. (Exh. A, p. 17).

7. Plaintiff called the police because Ward had her keys and she wanted to leave Ward's apartment. (Exh. A, p. 17).

8. Prior to the arrival of Peoria City Police officers, Ward returned Plaintiff's keys, locked Plaintiff out of the apartment and left the premises. (Exh. A, pp. 17-18).

9. Peoria City Police Officers Piercy and Chalus responded to Plaintiff's call at approximately 7:00 pm. (Exh. A, pp. 18-21, exh. 3)

10. When police arrived, Plaintiff was outside of Ward's apartment. (Exh. A, pp. 17-18).

11. At approximately 7:10 pm, Plaintiff was arrested for obstructing an officer. (Exh. A, p. 21, exh. 3; Exhibit B: Cargill's Deposition Transcript ("Exh. B"), exh. 7).

12. Plaintiff was transported to the Peoria County Jail in the paddy wagon by Peoria City Police Officer Anderson. (Exh. A, p. 21, exh. 3; Exh. B, Cargill exh. 7; Exhibit C: Dearing's Deposition Transcript ("Exh. C"), pp. 26-27).

13. Cargill and Trowbridge were assigned to the Intake area at the time Plaintiff arrived at the jail. (Exh. B, pp. 16-18, exh. 7; Exh. C, pp. 10-11, exh. 1; Exhibit E: Trowbridge's Deposition Transcript ("Exh. E"), p. 8)

14. Dearing was the Sergeant on duty when Plaintiff arrived at the jail. (Exh. C, pp. 7, 25, exh. 1)

15. DuBois was assigned to 91-SP when Plaintiff arrived at the jail. (Exhibit D: DuBois' Deposition Transcript ("Exh. D"), p. 7)

16. When Plaintiff arrived at the Jail, it was Cargill's impression that Plaintiff was uncooperative in getting out of the transport van. (Exh. B, pp. 74-76).

17. Cargill tried unsuccessfully to coax Plaintiff out of the transport van. (Exh. B, pp. 20-22, exh. 1).

18. Plaintiff yelled obscenities, including "several bitches", at and was belligerent towards Cargill. (Exh. A, pp. 22-25; Exh. B, pp. 20-22; Exh. C, pp. 27-28).

19. Officer Anderson removed Plaintiff from the transport van and she was escorted into the jail's intake screening area. (Exh. A, pp. 22-24; Exh. B, pp. 21-23, 31, exh. 1).

20. Plaintiff smelled of alcohol and was noncompliant. (Exh. B, pp. 23, 26-27, 73, 76, 78, exh. 1; Exh. C, pp. 27-29).

21. Plaintiff continued to cuss at and was verbally combative towards Cargill. (Exh. B, pp. 23-26, exh. 1; Exh. C, p. 28).

22. Plaintiff admits she was agitated, a little "tipsy" and yelling. (Exh. A, pp. 23-25).

23. It was Cargill and Dearing's impression that Plaintiff was intoxicated. (Exh. B, pp. 33-34, exh. 2; Exh. C, pp. 33-34)

24. It was Dearing's impression from speaking with Officer Anderson that Plaintiff was "a pain in the butt." (Exh. C, pp. 26-27).

25. Cargill put Plaintiff in an arm lock for her own safety for the threats that Plaintiff was making. (Exh. B, p. 25).

26. To maintain the safety and order of the jail, Plaintiff was placed in a detox cell. (Exh. B, pp. 23-26, exh. 1; Exh. C, p. 28; Exh. E, p. 14)

27. At approximately 7:57 pm Cargill and Dearing escorted Plaintiff to a detox cell. (Complaint, para. 12; Exh. A, p. 24; Exh. B, pp. 33-34, exh. 1, 2; Exh. C, p. 29).

28. Plaintiff remained in the detox cell until approximately 2:18 am, when she was taken for booking. (Exh. A, pp. 30-32; Exh. B, exh. 2).

29. Throughout her time in the detox cell, Plaintiff repeatedly banged and knocked on the detox cell door. (Complaint, para. 15; Exh. A, pp. 25, 30; Exh. B, pp. 29, 56; Exh. D, p. 8).

30. At approximately 9:00 pm, Cargill noticed that Plaintiff was still wearing jewelry. (Exh. B, pp. 27, 38-40, exh. 5).

31. Jewelry is considered contraband that inmates are not allowed to take into holding cells. (Exh. C, p. 18).

32. Cargill repeatedly requested that Plaintiff remove the jewelry. (Exh. B, pp. 40-41, Cargill exh. 5).

33. Plaintiff repeatedly refused to remove the jewelry and requested to use the phone instead. (Exh. B, pp. 40, 52-53, 81, exh. 5).

34. Plaintiff called Cargill a bitch and "every name in the book". (Complaint, para. 17; Exh. A, pp. 25-26; Exh. C, p. 28).

35. Dearing never heard Cargill call Plaintiff a "nigger". (Exh. C, pp. 45-46).

36. Cargill called Trowbridge over. (Exh. E, p. 21)

37. Cargill informed Dearing of the situation and Dearing came to the detox cell for the removal of the jewelry. (Exh. B, pp. 38-39, exh. 5).

38. Cargill, Dearing and Trowbridge entered Plaintiff's cell to remove her jewelry. (Complaint, para. 18; Exh. A, pp. 26-28; Exh. B, p. 39, exh. 5; Exh. C, pp. 29-30; Exh. D, p. 9; Exh. E, p. 23).

39. DuBois was in the Intake area dropping off paperwork and noticed that Cargill, Dearing and Trowbridge were about to enter Plaintiff's cell to remove her jewelry. (Exh. D, pp. 9-10, 24).

40. DuBois had observed Plaintiff being disruptive earlier in the evening. (Exh. D, pp. 8-10, 24).

41. DuBois "stood by" outside the doorway of Plaintiff's cell in case his assistance was needed. (Exh. B, Cargill exh. 5; Exh. D, pp. 9-10, 24).

42. Plaintiff yelled at the officers while they removed her jewelry. (Exh. C, pp. 29-31; Exh. D, p. 14

43. Plaintiff did not struggle with the officers while they tried to remove her jewelry. (Exh. A, p. 29; Exh. B, p. 42; Exh. C, p. 35; Exh. D, p. 16; Exh. E, p. 23-24).

44. Plaintiff kneeled or sat on the floor while her jewelry was being removed. (Exh. A, pp. 26-28; Exh. B, p. 40-41; Exh. C, pp. 29-30; Exh. D, pp. 12-13; Exh. E, p. 21).

45. Plaintiff's earrings were difficult to remove. (Exh. A, p. 54; Ehx. B, pp. 41-42; Exh. C, pp. 31, 34-35; Exh. D, pp. 14-15).

46. Cargill and Dearing removed Plaintiff's necklace and two earrings. (Complaint, para. 21; Exh. A, p. 28; Exh. B, pp. 41-42; Exh. C, pp. 31-32; Exhibit G: Sheriff McCoy's Deposition Transcript ("Exh. G"), p.27).

47. Trowbridge and DuBois observed Cargill and Dearing remove Plaintiff's jewelry. (Complaint, para. 25; Exh. D, pp. 14-15; Exh. E, pp. 22-27).

48. No officers used any force against Plaintiff to remove her jewelry. (Exh. B, p. 43; Exh. C, pp. 35-36, 45; Exh. D, p. 23; Exh. E, p. 24).

49. Officers were at Plaintiff's cell for at most five to ten minutes trying to convince her to remove her jewelry and actually removing it. (Exh. A, p. 28; Exh. B, 42; Exh. C, p. 30; Exh. E, p. 24)

50. After the jewelry was removed, Plaintiff tried to stand up. (Exh. A, p. 29).

51. An officer placed his hand on Plaintiff's shoulder or arm and told her to stay down until the officers left the cell. (Exh. A, p. 29).

52. After removing Plaintiff's jewelry, the officers left Plaintiff's cell. (Exh. A, pp. 28-29; Exh. C, p. 31; Exh. D, p. 17; Exh. E, pp. 22-23).

53. Plaintiff remained in the detox cell until approximately 2:18 am on January 21, 2008, when she was taken for booking by Officer Ahart. (Exh. A, pp. 30-31; Exh. B, exh. 2)

54. At approximately 2:30 am on January 21, 2008, Plaintiff was examined by Nurse Roe at the jail. (Complaint, para. 27; Exh. A, pp. 31-32; Exh. B, exh. 6).

55. Nurse Roe noted that Plaintiff's right wrist and left cheek were slightly swollen and that Plaintiff's right outer thigh was reddened. (Exh. A, p. 32; Exh. B, exh. 6).

56. Nurse Roe issued an ice pack for Plaintiff's right wrist. (Complaint, para. 27; Exh. A, p. 32; Exh. B, exh. 6).

57. After being booked and seeing the nurse, Plaintiff was placed in the general holding cell for women. (Exh. A, pp. 32-33).

58. Plaintiff made phone calls to her sister, Elona Mason, and her children. (Exh. A, p. 33; Exhibit J: Kimberly Hobson's Deposition Transcript ("Exh. J"), p. 9).

59. Plaintiff was released from the Peoria County Jail at approximately 4:30 am on January 21, 2008. (Exh. B, exh. 7).

60. After Plaintiff was released from jail, Plaintiff's daughter, Kimberly Hobson, convinced her to seek medical attention at Methodist Hospital. (Complaint, para. 28; Exh. A, p. 35).

61. Plaintiff was treated at Methodist Emergency Room by Dr. Jason Stringer ("Dr. Stringer"). (Exhibit F: Dr. Stringer's Deposition Transcript ("Exh. F"), pp. 8-10, exh. 1).

62. Dr. Stringer ordered x-rays of Plaintiff's wrist and back. (Exh. F, pp. 32-33, exhs. 1, 2, 3).

63. The x-rays revealed no fractures in Plaintiff's wrist or back. (Exh. F, pp. 32-33, exhs. 1, 2, 3).

64. Dr. Stringer diagnosed Plaintiff with pain and swelling to the right wrist, blunt injury, a human bite wound, moderate elevation of systolic blood pressure and bruising-contusion to the wrist. (Exh. F, pp. 29-32, exh. 1).

65. Dr. Stringer noted bruising on Plaintiff's shoulder but no bite marks. (Exh. F, pp. 23-24, 29-31, exh. 1).

66. Plaintiff had no broken skin or active bleeding from the "bite". (Exh. A, pp. 35-36; Exh. F, pp. 21-23, exh. 1).

67. Plaintiff told medical staff that she was assaulted and bitten by a correctional officer at the jail. (Exh. A, p. 35; Exh. F, p. 21, exh. 1).

68. Based solely on Plaintiff's account and the presence of bruising, Dr. Stringer diagnosed a human bite wound. (Exh. F, pp. 29-31, 45-47, exh. 1).

69. Plaintiff was not treated for the "bite" wound.  (Exh. F, pp. 35-36, exh. 1).

70. Plaintiff did not request a swabbing of the "bite" wound. (Exh. F, pp. 36-38, exh. 1).

71. No DNA sample of the "bite" wound area was taken. (Exh. F, pp. 36-38, exh. 1).

72. No teeth impression of the "bite" was taken. (Exh. F, pp.36-38, exh. 1).

73. Plaintiff was treated with an Ace bandage, a splint, an ice pack and Tylenol #3. (Complaint, para. 28; Exh. A, pp. 35-36; Exh. F, pp. 19, 32-34, 38, exh. 1.).

74. Dr. Stringer also wrote a note excusing Plaintiff from work the next day and ordered her to limit the use of her sprained wrist for one week. (Exh. F, pp.33-34, exhs . 1, 4)

75. Based on Plaintiff's allegations of assault, medical staff notified the Peoria County Sheriff's Office. (Exh. A, p. 35; Exh. F, p. 19, exh. 1).

76. Peoria County Sheriff's Officers Hoyle and Guyton took Plaintiff's report at the hospital and took pictures of her injuries. (Exh. A, p. 36; Exhibit H: Steven Smith's Deposition Transcript ("Exh. H"), p. 8; Exh. J, pp. 11-12).

77. On January 22, 2008, Plaintiff filed a civilian complaint against the Defendant Officers at the Peoria County Jail. (Complaint, para. 29; Exh. A, p. 40).

78. Peoria Sheriff's Detectives investigated Plaintiff's complaint by interviewing Cargill, Dearing, DuBois and Trowbridge and determined the claim to be unfounded. (Exh. B, pp. 41, 70; Exh. C, pp. 36, 41; Exh. D, p. 18; Exh. E, p. 26; Exh. G, p. 9; Exh. H, pp. 9-10, exh. 2).

79. Jail Superintendent Steven Smith informed Plaintiff of the detectives' findings. (Exh. H, pp. 16-17, exh. 2).

80. In 2005 or 2006, Plaintiff and Ward were involved in another argument regarding Ward's infidelity that resulted in a physical altercation. (Exh. A, pp. 42-43, 49, exh. 4; Exh. I, p. 11-12; Exh. J, pp. 13-15).

81. During this physical altercation between Plaintiff and Ward, Plaintiff suffered whiplash, her hair was pulled out and Ward hit her. (Exh. A, pp. 42, 49, exh. 4; Exh. I, p. 12).

82. The police were called and Ward was arrested for domestic battery. (Exh. A, pp. 42, 48, exh. 4; Exh. I, p. 11; Exh. J, pp. 13-15).

## III.    STANDARD OF REVIEW

When there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law.  (F.R.C.P. Rule 56(c)). Although the facts must be reviewed in the most favorable light to the non-moving party, the Court should "draw only reasonable inferences, not every conceivable inference."  (*Devalk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987)). A "metaphysical doubt" concerning a fact issue is insufficient to prevent the grant of Summary Judgment and the non-movant has not presented a genuine issue if the record in its entirety would not persuade a rational trier of fact to find for the non-movant. (*Outlaw v. Newkirk,* 259 F.3d 833, 837 *(*7th Cir. 2001)). "Where a [plaintiff] pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" (*Ashcroft v. Iqbal*, ___ S.Ct. ___, 2009 WL 1361536 *12 (U.S. May 18, 2009), *citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). That is, if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the [plaintiff] has alleged - but has not "show[n]" - "that the pleader is entitled to relief." (*Ashcroft*, 2009 WL 1361536 *13, citing F.R.C.P. 8(a)(2)).

## IV.    ARGUMENT

At all times relevant hereto, Plaintiff was a pretrial detainee, (Exh. A, p. 21-30; Exh. B, exh. 7), which means that her claim properly arises under the Fourteenth Amendment of the U.S. Constitution. (Complaint, para. 1; *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir.2002).  However, courts apply the same Eighth Amendment deliberate indifference standard to claims arising under the Fourteenth Amendment (for pretrial detainees) and Eighth Amendment (for convicted prisoners) without differentiation. (*Board v. Farnham*, 394 F.3d 469, 477-78 (7th Cir.2005)*; Henderson v. Sheahan*, 196 F.3d 839, 844 n. 2 (7th Cir. 1999); *Mathis v.*

*Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)). That is, "[t]he distinction [between pretrial detainee and prisoner status] is immaterial since the legal standard for a §1983 claim is the same under either the Cruel and Unusual Punishment Clause of the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment." (*Whiting v. Marathon Co. Sheriff's Dep't*, 382 F.3d 700, 703 (7th Cir. 2004)).

A. <u>Plaintiff Cannot Make a *Prima facie* Case for Use of Excessive Force Since Her Alleged Injuries Are *De Minimis*</u>

The standard in a §1983 action alleging excessive force against a pretrial detainee is whether the Defendant "acted deliberately or with callous indifference, evidenced by an actual intent to violate [the Plaintiff's] rights or reckless disregard for his rights." (*Wilson v. Williams,* 83F.3d 870, 875 *(*7th Cir. 1996) (quoting *Anderson v. Gutschenritter*, 836 F.2d 346, 349 *(*7th Cir. 1988)). "'[T]he core judicial inquiry' is 'whether force was applied in a good-faith effort to maintain or restore order, or maliciously and sadistically to cause harm." (*Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Hudson v. McMillian*, 503 U.S. 1, 7). However, "[t]hat is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action." (*Hudson*, 503 US at 9). Rather, to be sustained, a claim of excessive force must involve force that is more than *de minimis*. (*Outlaw*, 259 F.3d at 839).

The severity of a Plaintiff's injuries is relevant to determine whether the force a Defendant used was more than merely *de minimis*. (*Outlaw*, 259 F.3d at 837-838). The quantum of force required for a constitutional violation is that which is "repugnant to the conscience of mankind." (*Hudson*, 503 U.S. at 10, *quoting Whitley v. Albers*, 475 U.S. 312, 327 (1986)). Thus, not every push or shove by a prison guard violates a prisoner's constitutional rights. (*See Hudson*, 503 U.S. at 9).

In *Outlaw v. Newkirk*, 259 F.3d 833, 834 (7th Cir. 2001), an inmate filed a § 1983 action for excessive force, alleging that a prison officer intentionally slammed the inmate's hand in a cuffport hatch, causing severe pain, swelling and bruising. The prison nurse examined the inmate's hand and noted slight swelling, decoloration, tenderness, pain and difficulty moving digits. (*Id*. at 839). The inmate was treated with an Ace wrap, pain medication and an ice pack. (*Id*.) The Seventh Circuit found that the inmate's injuries were minor, superficial injuries that did not involve "force that is repugnant to the conscience of mankind." (*Id*., *citing Hudson*, 503 U.S. at 9-10).

In the instant case, due to the alleged use of excessive force by Cargill and Dearing, Plaintiff claims injuries including contusions, abrasions, wrist sprain, swelling and pain in her back, shoulder pain and a human bite wound. (Complaint, para. 28). However, Plaintiff not only can prove no more serious injuries than the inmate in *Outlaw*, but she received essentially the same treatment as well. Plaintiff was seen by Nurse Roe at the Peoria County Jail at approximately 2:30 am on January 21, 2008. (Exh. A, pp. 30-32; Exh. B, exh. 6). Nurse Roe noted that Plaintiff's right wrist was slightly swollen and that Plaintiff's left cheek and right outer thigh were slightly reddened. (Exh. A, p. 32; Exh. B, exh. 6). Nurse Roe issued an ice pack for Plaintiff's right wrist. (Exh. A, p. 32; Exh. B, exh. 6).

After being released from the Peoria County Jail, Plaintiff's daughter convinced her to seek treatment at Methodist Medical Center. (Exh. A, p. 35). At Methodist, Dr. Jason Stringer ordered x-rays taken of Plaintiff's back and wrist, with no evidence of fractures found. (Exh. F, pp. 32-33, exhs. 1, 2, 3). While Dr. Stringer diagnosed Plaintiff with a human bite wound, moderate elevation of systolic blood pressure, blunt injury, pain and swelling of the right wrist, and bruising-contusion of the wrist, (Exh. F, pp. 29-32, exh. 1), Plaintiff received no treatment

for the elevated blood pressure or the human bite wound. (Exh. F, pp. 35-36, exh. 1). In fact, bruising was present in the area of the alleged "bite", but no abrasions or active bleeding existed. (Exh. F, p. 22-24, 29-31, exh.1). Nor did the doctor or nurses note any teeth marks. (*Id.*) Thus, Plaintiff did not receive antibiotics nor was the "bite" dressed or splinted in any way, which are general treatments for bite wounds. (Exh. F, p. 35-36, exh. 1).

Notably, Plaintiff also did not request that a swab of the "bite wound" be taken for DNA testing, nor was any teeth impression of the "bite" taken. (Exh. F, p. 36-38). Had Plaintiff requested such readily available evidence be preserved, then she would have been able to definitively prove not only that someone bit her but exactly who bit her. However, she let this evidence be destroyed. Therefore, we are only left with what the medical record shows -- that based on Plaintiff's story and bruising being present in the area of the alleged "bite", Dr. Stringer diagnosed a human bite wound that did not require any treatment. (Exh. F, pp.18, 21, exh.1).

In the end, Plaintiff was treated with an Ace bandage, a splint and an ice pack for her wrist, as well as Tylenol #3 for the pain. (Exh. A, pp. 35-36; Exh. F, pp. 34, 38-39, exh. 1). That is, Plaintiff was "basically treated for the wrist and given something for the pain." (Exh. A, p. 36). In other words, with the addition of the splint, Plaintiff received the exact same treatment for her *de minimis*, superficial injuries that the inmate in *Outlaw* did – an Ace wrap, an ice pack and pain medication. While it is not necessary that Plaintiff demonstrate significant injury to state a claim for excessive force, "the degree of injury is relevant to determining whether the use of force could plausibly have been thought necessary in a particular situation," (*Lunsford v. Bennett*, 17 F.3d 1574, 1582 (7th Cir. 1994)), and a minor injury supports the conclusion that the alleged January 20, 2008 incident was "at most . . . a *de minimis* use of force not intended to cause pain or injury to the inmate." (*Id.*).

The Court should find that Plaintiff's alleged injuries are distinguishable from the injuries resulting from the beating perpetrated during an intra-prison transfer in *Hudson*, which resulted in, among other things, loosened teeth and a broken dental plate. (*Hudson*, 503 U.S. at 4). Nor does the instant case involve the kind of suffering that accompanies the use of the hitching post, invalidated in *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). At most, Plaintiff can prove she experienced bruising, swelling and a sprained wrist. (Complaint, para. 28). Thus, the Court should find that Plaintiff's allegations regarding use of excessive force against her fall short of what is required to state a claim under the Fourteenth Amendment. As such, summary judgment must be entered in favor Cargill and Dearing.

B.  Plaintiff Cannot Prove a *Prima facie* Case for Use of Excessive Force

Even if the Court finds that Plaintiff's injuries are not *de minimis*, Plaintiff still cannot prove a *prima facie* case for the use of excessive force and summary judgment is still appropriate. If the force used is more than *de minimis*, the primary issue becomes "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." (*Whitley*, 475 U.S. at 320-21; *see also Outlaw*, 259 F.3d at 837).

1. *Plaintiff cannot satisfy subjective component of excessive force claim*

Under the controlling precedent of the U.S. Supreme Court, the test for determining whether a prisoner has suffered cruel and unusual punishment has both an objective and a subjective component. (*Thomas v. Stalter*, 20 F.3d 298, 301 (7th Cir. 1994)). The subjective component involves an inquiry into whether the officials acted with a sufficiently culpable state of mind. (*Fillmore v. Page*, 358 F.3d 496, 509(7th Cir. 2004), *discussing Thomas*, 20 F.3d at 301). "In making that determination, several factors are relevant, including the need for the

application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." (*Fillmore*, 358 F.3d at 504, *citing Dewalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 1999)). Put another way, for a constitutional violation to exist, a plaintiff in a §1983 action must establish that the prison officers acted wantonly. (*Wilson v. Seiter*, 501 U.S. 294, 296 (1991); *Fillmore*, 358 F.3d at 504, *quoting Whitley*, 475 U.S. at 322; *see also Hudson*, 503 U.S. at 6 (explaining to prove an excessive use of force claim, a plaintiff must first satisfy a subjective requirement that the force used by the officers "inflicted unnecessary and wanton pain and suffering)).

"[N]egligence or even gross negligence is not enough; rather a plaintiff must show *actual intent* or *deliberate indifference* on the part of state actors to make out [a Fourteenth Amendment] claim". (*James v. Milwaukee Co.*, 956 F.2d 696, 699 (7th Cir. 1992) (emphasis in original)). Indeed, even objectively serious injuries suffered by prisoners, without the requisite *mens rea* on the part of prison officials, will not comprise a constitutional injury. (*Harper*, 400 F.3d at 1065, *referencing Wilson*, 501 U.S. at 301). In other words, the force exerted must be so egregious as to "shock the [conscience] of mankind." (*Fillmore*, 358 F.3d at 504).

In the instant case, each correctional officer testified that Plaintiff was uncooperative and verbally abusive during her stay at the jail. (*See*, *e.g.*, Exh. B, pp. 20-22; Exh. C, pp. 27-28; Exh. D, pp. ; Exh. E, pp. ). Plaintiff refused to get out of the transport van upon first arriving at the jail, (Exh. B, pp. 20-22, 74-76), and yelled at and called Cargill names. (*Id.*, Exh. A, pp. 22-25; Exh. C, pp. 27-28). Plaintiff smelled of alcohol, (Exh. B, p. 23, exh. 1; Exh. C, pp. 27-29), and due to her disruptive behavior, it was Cargill and Dearing's impression that she was intoxicated. (Exh. B, pp 33-34, exh. 2; Exh. C, pp. 33-34). Plaintiff was placed in a detox cell not only for the

safety and protection of the jail staff that she had been threatening but also for the safety of other inmates -- "[b]ecause she started getting verbal, and there [were] other women in what we call 'Holding C.' We figured she might try to start something with them." (Exh. E, p. 14; *see also*, Exh. B, pp. 23-26, exh. 1; Exh. C, pp. 28-29).

While performing a routine cell check, Cargill noticed that Plaintiff was still wearing jewelry. (Exh. B, pp. 27, 38-40, exh. 5). Jewelry is considered contraband, along with "money, . . . gloves, cigarettes, cigarette lighter, anything that can be combustible or hurt anybody", that prisoners cannot have in their cells. (Exh. C, p. 18). Cargill repeatedly asked Plaintiff to remove the jewelry herself, but Plaintiff repeatedly refused. (Exh. B, pp. 40-41, 52-53, 81, exh. 5). Plaintiff called Cargill a bitch and "every name in the book." (Exh. A, pp. 25-26). Cargill called Trowbridge and Dearing for back-up before entering Plaintiff's cell to remove the jewelry. (Exh. B, pp. 38-39, exh. 5).

Each correctional officer testified that Cargill, Dearing and Trowbridge entered Plaintiff's cell to remove her jewelry. (A, p. 26-28; Exh. B, p. 39, exh. 5; Exh. C, p. 29-30; Exh. D, p. 9; Exh. E, p. 23). As DuBois had observed Plaintiff being disruptive earlier in the night, he "stood by" outside the cell in case his assistance was needed. (Exh. D, pp. 8-10, 24). Plaintiff yelled at the officers while they removed her jewelry, (Exh. C, p. 29-31; Exh. D, p. 14), but did not struggle with them. (Exh. A, p. 29; Exh. B, p. 42; Exh. C, p. 35; Exh. D, p. 16; Exh. E, p. 23-24). While Plaintiff's earrings were difficult to remove, (Exh. A, p. 54; Ehx. B, p. 41-42; Exh. C, p. 31, 34-35; Exh. D, pp. 14-15), Cargill and Dearing removed them, along with her necklace, without any use of force. (Exh. B, p. 41-43; Exh. C, pp. 31-32, 35-36, 45). After Plaintiff's jewelry was removed, the officers left Plaintiff's cell. (Exh. A, p. 28-29; Exh. C, p. 31; Exh. D, p. 17; Exh. E, p. 22-23).

Obviously, based on the correctional officers' testimony, no constitutional violation occurred. However, Plaintiff alleges that Officer Cargill grabbed hold of her and threw her to the ground. (Exh. A, pp. 26-28). Plaintiff then alleges that Officer Cargill pulled one of Plaintiff's arms behind her back and bit her shoulder. (Exh. A, p. 27). At some point, Cargill also allegedly slammed her knee into Plaintiff's thigh. (Exh. A, p. 27). In addition, Plaintiff alleges that her hair was pulled and that she was hit or kneed in the back, though she cannot say by whom. (Exh. A, p. 27). The entire incident lasted one to two minutes. (Exh. A, p. 28).

Even taking Plaintiff's allegations as true, Plaintiff can still not prove that any force used by Cargill was not necessary to maintain order. That is, if any force was applied, it only lasted one or two minutes, (Exh. A, p. 28), and was used to ensure the removal of contraband, (Exh. C, p. 18), off of a detainee who had demonstrated repeated uncooperativeness and verbal abuse towards correctional officers. (Exh. A, pp. 42-43, 49; Exh. I, p. 11-12). Given the totality of the circumstances, one cannot say that any force that may have been used was "totally without penological justification." (*Fillmore*, 358 F.3d at 504, *quoting Hope*, 536 U.S. 730, 737).

Additionally, the doctrine of respondeat superior does not apply to § 1983 suits, which means that Plaintiff must allege personal acts of Defendants in order to state a claim of a violation of Plaintiff's civil rights. (*Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996)). However, Plaintiff cannot prove a claim against Dearing in his individual capacity for use of excessive force because Plaintiff cannot allege any personal involvement or bad motivation by Dearing in the alleged use of excessive force.

Plaintiff stated that Dearing was present during the alleged use of excessive force but cannot allege anything more with certainty. (Exh. A, p. 26-27). In fact, Plaintiff stated, "The taller officer, I don't know if he was trying to help her, assist her in what she was doing to me,

assault me, or if he was trying to get her to stop." (Exh. A, p. 27). In other words, according to Plaintiff, Dearing could have been trying to stop the alleged use of excessive force rather than participating. Officer Dearing's mere presence in Plaintiff's cell, without evidence of any action on Dearing's part, is not enough to establish any violation of Plaintiff's Constitutional rights for the use of excessive force. (*See, e.g.*, *Harper v. Albert*, 400 F.3d 1052, 1066 (7th Cir. 2005)).

 2. *Plaintiff cannot satisfy objective component of excessive force claim*

In addition to satisfying the subjective requirement of an excessive force claim, a plaintiff must also satisfy an objective requirement. (*Thomas*, 20 F.3d at 301). A § 1983 excessive force claim requires a plaintiff to demonstrate that a state actor's use of force was "objectively unreasonable" under the circumstances. (*Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006)). Within this context, if an officer reasonably, *but mistakenly*, believed that a suspect was likely to fight back, the officer would be justified in using more force than in fact was needed. (*Saucier*, 533 U.S. at 205).

The Court need not decide whose version of events is accurate, rather the Court must determine whether Correctional Officers acted unreasonably, given the totality of the circumstances. That is, Plaintiff must show that Correctional Officers' actions, taken contextually, were "objectively harmful enough" to offend "contemporary standards of decency." (*Hudson*, 503 U.S. at 8). The objective component focuses on whether, in light of contemporary standards of decency, the alleged deprivation was sufficiently serious. (*Fillmore*, 358 F.3d at 509, *discussing Thomas*, 20 F.3d at 301).

Moreover, the U.S. Supreme Court advises that review of a claim of the use of excessive force in a prison is to be deferential to the prison, and "that neither the judge nor jury [may] freely substitute their judgment for that of Officers who have made a considered choice."

(*Whitley*, 475 U.S. at 320-21). The Supreme Court notes that courts must remain mindful of the fact that correctional officers decisions are "necessarily made in haste, under pressure, and . . . without the luxury of a second chance." (*Whitley*, 475 U.S. at 320). "Equally relevant are such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." (*Whitley*, 475 U.S. at 321). "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." (*Id.* at 322).

Prior to her arrival at the jail, Plaintiff was arrested for obstructing an officer, (Exh. B, exh. 3; Exh. B, exh. 7), which itself suggests noncompliant behavior. In fact, the impression that Dearing received from the transport officer was that Plaintiff was a "pain in the butt." (Exh. C, pp. 26-27). As explained above, upon observing Plaintiff's disruptive behavior and smelling alcohol, Cargill and Dearing believed that Plaintiff was drunk. (Exh. B, pp. 33-34, exh.2; Exh. C, pp. 33-34). By Plaintiff's own assertion she had been drinking, was a little "tipsy" and yelling. (Exh. A, pp. 16, 23-25). She was placed in a detox cell for the safety of both correctional officers and other inmates. (Exh. B, pp. 23-26; Exh. C, pp. 28-29; Exh. E, p. 14).

Given these circumstances, it is reasonable to see why Cargill would want Dearing and Trowbridge present prior to entering Plaintiff's cell to remove her jewelry and why DuBois would feel the need stand by outside Plaintiff's cell door -- in case Plaintiff's behavior escalated to more than verbal abuse. Moreover, for the reasons stated above, Plaintiff cannot prove that anyone bit her, let alone one of the Defendant Correctional Officers. In fact, this destruction of evidence by Plaintiff gives rise to the presumption that any DNA results or teeth impressions

would have shown that Correctional Officers did not bite her. (*See Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir. 1985) (finding that bad-faith destruction of document relevant to proof of issue at trial gives rise to strong inference that production of the document would have been unfavorable to party responsible for its destruction); *see also Jones v. Hawley*, 255 F.R.D. 51, 52 (D.D.C 2009), ("[i]t is settled beyond all question that at common law the destruction, alteration, or failure to preserve evidence in pending or reasonably foreseeable litigation warrants the finder of fact inferring that the destroyed evidence would have been favorable to the opposing party.") The minimal injury that Plaintiff can prove - the sprained wrist - even if attributed to a Correctional Officer, shows at most a mistaken over-reaction on the correctional officer's part but hardly rises to a level that shocks the conscience.  Thus, Plaintiff cannot prove a *prima facie* case and summary judgment must be entered in favor of Cargill and Dearing.

C.  Plaintiff Cannot Make a *Prima facie* Case for Failure to Intervene

       Defendants have difficulty responding to Count II of Plaintiff's Complaint due to its lack of specificity. (Complaint, paras. 35-36). Count II merely claims that "Defendant-Officers" were deliberately indifferent to the use of excessive force, without naming any officers in particular that failed to intervene. (*Id*.). However, as the Complaint specifically alleges that Cargill and Dearing used excessive force when removing Plaintiff's jewelry, (Complaint, para. 33), and that Trowbridge and DuBois were present when Cargill and Dearing removed Plaintiff's jewelry, (Complaint, para. 25), by process of elimination Count II should be referring to DuBois and Trowbridge. Therefore, Defendants arguments below are couched in terms of DuBois and Trowbridge's actions. However, to the extent that Plaintiff is alleging that Cargill or Dearing should have intervened to stop each other when not allegedly using excessive force themselves, Plaintiff has still failed to state a claim for all of the same reasons.

In the Seventh Circuit, "police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right through the use of excessive force but fail to do so" may be held liable. (*Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000), citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *see also Fillmore*, 358 F.3d at 505-06). The standard in a §1983 action alleging that an officer failed to intervene to prevent another law enforcement officer from infringing on the constitutional rights of a citizen is two pronged. The officer must have (1) known that excessive force was being used in violation of the detainee's constitutional rights; *and* (2) had a realistic opportunity to intervene to prevent the harm from occurring. (*Lanigan v. Village of East Hazel Crest, Illinois*, 110 F.3d 467, 477 (7th Cir. 1997), *citing Yang*, 37 F.3d at 285, *citing Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994)). That is, Defendant Officers can only be held liable if they knew that Cargill or Dearing was using excessive force or if they were deliberately indifferent to the actions of Cargill or Dearing *and* if they also had a realistic opportunity to intervene to prevent the use of excessive force. (*Lanigan*, 110 F.3d at 478).

*1. No Underlying Constitutional Violation Means No Valid Claim for Failure to Protect*

For there to be a failure to protect, it logically follows that there must first exist an underlying constitutional violation. (*See Fillmore*, 358 F.3d at 506 ("Simply put, there was no constitutionally impermissible failure to intervene because there was no violation that compelled intervention.")). For the reasons and arguments stated above, no excessive force was used in violation of Plaintiff's constitutional rights, making it impossible for any Defendant Officers to intervene to prevent the non-existent excessive use of excessive force. Therefore, if the Court determines that Plaintiff has failed to make a *prima facie* case for use of excessive force, then

Plaintiff has equally failed to state a claim for failure to protect. If so, summary judgment is appropriate and must be granted.

### 2. Defendants were not deliberately indifferent

Even if the Court finds that Plaintiff did state a claim for use of excessive force, Plaintiff still cannot succeed on her claim that any correctional officers failed to protect her from the use of excessive force because they could not know that excessive force was being used. To succeed in a failure to protect claim, a plaintiff must show that a "substantial risk of serious harm" existed and that each defendant subjectively disregarded that risk. (*Farmer*, 511 U.S. 825, 834 and 837 (1994)). In order to prove deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." (*Farmer*, 511 U.S. at 837). However, it is not sufficient to show that the prison guard failed to act reasonably. (*Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995) (disagreed with on other points of law)). "Mere negligence or even gross negligence does not constitute deliberate indifference." (*Borello v. Allison*, 446 F.3d 742, 749 (7th Cir. 2006), *citing Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996), *citing Wilson v. Seiter*, 501 U.S. 294, 305 (1991)). Moreover, for a violation of the Constitution to occur, an "objectively, 'sufficiently serious'" risk to the inmate's health or safety must be present (*Farmer v. Brennan*, 511 U.S. at 834 (internal citations omitted)). "A medical condition is deemed to be serious if it may be 'life threatening or pose[s] a risk of needless pain or lingering disability if not treated at once." (*Karraker v. Peters*, 1995 WL 508074 *3 (7th Cir. Aug. 18, 1995), *citing Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991).

For the reasons stated above regarding Plaintiff's *de minimis* injuries, Plaintiff's injuries were not sufficiently serious to warrant a constitutional violation. In fact, the minimal injuries

suffered support the fact that a serious harm did not exist.  Moreover, Plaintiff never alleges that she called out for the officers to stop or asked for help at any time during the alleged use of excessive force. (*See* Complaint; Exh. A, p. 29). In fact, by Plaintiff's own statements, the entire incident "didn't last that long. It didn't last that long at all. It was relatively quick. Maybe – I don't know – a minute or two. It wasn't that long." (Exh. A, p. 28). In other words, there was not enough time for Defendant Officers to realize that any harm was being committed, let alone to take action to stop it. (*See, e.g., Lanigan*, 110 F.3d at 488 (finding that the contact between one officer and arrestee involving a poke, a shove and a verbal exchange was not so prolonged that another officer could know or be deliberately indifferent to the first officer's actions)). Thus, summary judgment must be entered in each officer's favor.

### 3. *Defendants did not have a reasonable opportunity to intervene*

Finally, even if force was used, there was not a realistic opportunity for Defendant Officers to intervene. A reasonable opportunity to intervene includes the existence of a reasonable time for intervention and reasonable probability of success. (*Yang*, 37 F.3d at 286). Specifically with regards to Trowbridge, Plaintiff alleges that he stood by the door the whole time. (Exh. A, p. 28). DuBois never entered the cell but was standing outside the cell door. (Exh. D, p. 10). Again, given the short one to two minute time period alleged, there was not enough time for Trowbridge or DuBois to realize that excessive force was being used and then come from the door or enter the cell, respectively, with a reasonable probability of stopping said force.

### D.  Defendants Are Entitled to Qualified Immunity

Even if Plaintiff could prove a *prima facie* case of use of excessive force and/or failure to intervene, each Correctional Officer is entitled to qualified immunity. Qualified immunity is a

legal question properly determined by a court and answered in reference to the particular facts of the case. (*Rokovich v. Wade*, 850 F.2d, 1180, 1202-02 (7th Cir. 1987) (abrogated on other grounds); *see also Simkunas v. Tardi*, 930 F.2d 1287, 1291 (7th Cir. 1991); *Riccardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004) (*citing Saucier*, 533 U.S. at 202; *Anderson*, 483 U.S. 635 (explaining immunity is a matter of law for the court to decide without deference to the jury's resolution-and preferably before the case goes to the jury)). The question of whether a public official is entitled to qualified immunity is an objective one, making summary judgment a practical and effective means of terminating unnecessary litigation. (*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Rakovich v. Wade*, 850 F.2d 1180, 1205 (7th Cir. 1987) (en banc)). Moreover, the purpose of qualified immunity is to avoid of excessive disruption of governmental functions and to dispose of frivolous claims in the early stages of litigation. (*Saucier v. Katz*, 533 U.S. 194, 201 (2001)). That is, qualified immunity "is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." (*Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985);

Qualified or "good faith" immunity "shields the officers from suit 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (*Harlow*, 457 U.S. at 815). "Even defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard." (*Davis v. Scherer*, 468 U.S. 183, 190 (1984)).

The test for qualified immunity is two-pronged, and the court may consider the prongs in whichever order it deems most prudent given the particular facts of the case. (*Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009)). One prong of the inquiry requires the plaintiff to present

evidence that, taken in the light most favorable to the plaintiff, would allow a reasonable fact finder to determine that he has been deprived of a constitutional right. (*Saucier*, 533 U.S. at 201). In other words, when an officer raises the defense of qualified immunity, the plaintiff bears the burden of showing that the officer violated a clearly established constitutional right. (*Rakovich*, 850 F.2d at 1209, citing *Abel v. Miller,* 824 F.2d 1522, 1534 (7th Cir.1987), citing *Davis v. Scherer,* 468 U.S. 183, 197 (1984)). This may be achieved by showing either: (1) a "closely analogous case" that establishes the constitutional right; or (2) "evidence that the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts." (*Casteel v. Pieschek,* 3 F.3d 1050, 1053 (7th Cir. 1993), citing *Rice v. Burks,* 999 F.2d 1172, 1173-74 (7th Cir.1993); *McDonald v. Haskins,* 966 F.2d 292 (7th Cir.1992) ).

The other prong requires the court to determine whether the particular constitutional right was clearly established at the time of the alleged violation. (*Saucier*, 533 U.S. at 201). In other words, the court assesses the objective legal reasonableness of the official's actions *at the time* of the alleged violation and asks whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." (*Id.* at 202). "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *(Id.* at 201). If the right was clearly established, the government actor is not entitled to qualified immunity. Or put another way, Defendants are entitled to qualified immunity unless it was clearly established that their conduct was unconstitutional. (*Pearson*, 129 S.Ct. at 812; s*ee also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)).  Unless both prongs can be proven, Defendants are entitled to qualified immunity. (*Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir.2000)).

Moreover, the doctrine "gives public officials the benefit of the doubt," (*Elliot v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991)), and entitles police officers who exercise discretion to an "accommodation for reasonable error . . . because officials should not err always on the side of caution because they fear being sued." (*Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). Its purpose is to protect all but the plainly incompetent or those who knowingly violate the law. (*Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Furthermore, it protects those officials who act within the "hazy border" between the lawful and the unlawful. (*Riccardo v. Rausch*, 359 F.3d 510, 515 (7th Cir. 2004).

"The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." (*Saucier*, 533 U.S. at 205). "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense. (*Id.)*. The Supreme Court cautions against the "20/20 vision of hindsight" in favor of deference to the judgment of reasonable officers on the scene. (*See, e.g. Graham*, 490 U.S. at 393; 396).

Thus, Defendants reassert their arguments that Plaintiff cannot show that she suffered any constitutional violation. Further, Plaintiff can offer no evidence to support the allegation that Defendants were on notice that their conduct was clearly unconstitutional. Lastly, even if the Court finds mistakes were made by Defendants, no evidence supports the argument that such mistakes, if made, were unreasonable, given the totality of the circumstances involved. Thus, the Court should find that any misperceptions were reasonable under the circumstances and that each Defendant is protected from liability by qualified immunity. As such, summary judgment is appropriate and should be granted in favor of each Defendant Officer.

E.   Plaintiff Cannot Make a *Prima Facie* Case for an Illinois Hate Crime

Count III of Plaintiff's Complaint alleges that Cargill and Dearing committed a battery on Plaintiff because of her race, (Complaint, para. 40) – Plaintiff being African-American and Cargill and Dearing being Caucasian. (Complaint, paras. 38-39). "[A] plaintiff states a claim [under the Illinois Hate Crime Act, (720 ILCS 5/12-7.1),] if he alleges injury resulting from an assault or battery that was motivated because of his actual or perceived race, ancestry, or national origin." (*Abdoh v. City of* Chicago, 930 F.Supp. 311, 313 (N.D. Ill. 1996)). Pursuant to Section 12-3 of the Illinois Criminal Code, "[a] person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." (720 ILCS 5/12-3). That is, in the instant case, Plaintiff must allege (1) a battery; (2) injury resulting from that battery; and (3) racial motivation for the battery. However, Plaintiff cannot prove injury, battery or racial motivation on the part of Cargill or Dearing.

 1.   *Plaintiff cannot prove Cargill committed a Hate Crime*

Plaintiff has not alleged a battery by Cargill. If any force was applied by Cargill during the removal of Plaintiff's jewelry, for the reasons stated above, it was *de minimis* force that was legally justified in the removal of contraband that inmates are not allowed to have in their cells. (Exh. C, p. 18). Therefore, no battery occurred and summary judgment must be entered in favor of Cargill.

Moreover, Plaintiff cannot prove injuries resulting from any alleged battery. Plaintiff alleges a sprained wrist, bruises, contusions, back pain and swelling, and a human bite wound. (Complaint, para. 28). However, for the reasons stated above, Plaintiff cannot prove that Cargill or Dearing caused these injuries. In point of fact, Plaintiff's injuries could have stemmed from

any number of places. Plaintiff was admittedly banging her fists on the cell door "forever", (Exh. A, p. 25). As she was in the detox cell for approximately six hours, (Exh. B, exh. 2), she certainly could have injured her wrist herself by pounding on the door for such a long period of time. Directly prior to being arrested Plaintiff was also involved in an argument with her boyfriend, Ward, over his infidelity. (Exh. A, pp. 16-17). Another woman had been calling Ward's cell phone and at some point while Plaintiff was at Ward's apartment, his land line phone was broken. (*Id*.) During the argument, Ward took Plaintiff's keys and refused to let her leave the apartment so she called the police and was later arrested herself for obstructing an officer (*Id*.) Ward has battered Plaintiff before for an argument over the exact same issue, with the resulting injuries of pulled hair, a swollen face and whiplash. (Exh. A, pp. 42-43, 49; Exh. I, p. 11-12). Therefore, as Plaintiff's injuries cannot be proven to be caused by Cargill, summary judgment must be entered in her favor.

Finally, Plaintiff cannot prove racial motivation on the part of Cargill. Plaintiff alleges that at one point prior to entering Plaintiff's cell, Cargill called her a nigger. (Exh. A, p. 25). However, Plaintiff only alleges that Cargill used this racial slur one time, (*see* Exh. A), and never alleges any racial slurs were used during the alleged use of excessive force. (*See* Complaint; Exh. A). The use of one racial slur at a time prior to the actual alleged use of force does not show that the use of force was caused because of racial motivation. On the contrary, Plaintiff admits to calling Cargill "every name in the book," (Exh. A, p. 25), including "several bitches." (Exh. A, p. 23). In fact, during the alleged use of excessive force, Plaintiff stated that Cargill repeatedly said, "So I'm a bitch, huh?" (Exh. A, pp. 27, 29). Plaintiff also testified that Cargill repeatedly called Plaintiff a "crazy bitch" during the alleged incident. (Exh. A, p. 29). If anything, Plaintiff's allegations imply that Cargill merely reacted to Plaintiff's repeated verbal assaults on Cargill and

that it had absolutely nothing to do with Plaintiff's race. Thus, minus a battery, injury or racial motivation, summary judgment must be entered in favor of Cargill and against Plaintiff for Count III.

   2.   *Plaintiff cannot prove that Dearing committed a Hate Crime*

For all of the reasons stated above for why Plaintiff cannot prove that Cargill committed a Hate Crime, Plaintiff can also not prove that Dearing committed a Hate Crime. Moreover, as stated previously, Plaintiff does not allege, nor can she prove, that Dearing participated in any alleged excessive use of force while officers removed Plaintiff's jewelry and even suggests he may have been trying to stop it. (Exh. A, pp. 26-27). For the same reasons, Plaintiff cannot prove that Dearing participated in any alleged battery involving the same incident, as well, and summary judgment must be entered in Dearing's favor for Count III.

Additionally, any claimed injuries stemming from the alleged battery could not have been caused by Dearing, as Plaintiff does not allege that Dearing participated in any alleged battery or use of excessive force. (Exh. A, pp. 26-27). Furthermore, pursuant to § 2-204 of the Illinois Tort Immunity Act, (745 ILCS 10/1-101 et seq.), "a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person." In other words, Dearing is immune for any injuries caused by any alleged acts of Cargill. (S*ee, e.g., Payne for Hicks v. Churchich*, 161 F.3d 1030, 1044 (7th Cir. 1998); *Thomas v. Sheahan*, 499 F.Supp.2d 1062, 1100 (N.D. Ill. 2007); *Clark v. City of Chicago*, 595 F.Supp. 482, 487 (N.D. Ill. 1984); *Means v. City of Chicago*, 535 F.Supp. 455, 465 (N.D. Ill. 1982)). Thus, summary judgment must be entered in Dearing's favor due to lack of any injury.

Plaintiff also stated that no other officers besides Cargill ever referred to her with any racial terms. (Exh. A, p. 55). That is, Dearing never called Plaintiff a nigger or any other racially

derogatory term. (*Id.*). Moreover, Dearing never heard Cargill call Plaintiff a nigger. (Exh. C, pp. 45-46). In fact, Plaintiff never alleges that Dearing was present during or had any knowledge of Cargill's alleged one time use of a racial slur, and Plaintiff has made no allegations that Dearing's conduct towards her was in any way influenced by her race. (*See* Complaint; Exh. A). Therefore, minus any battery, injury or racial motivation, Plaintiff cannot prove that Dearing committed a hate crime and summary judgment must be entered in Dearing's favor and against Plaintiff for Count III.

## V.      CONCLUSION

WHEREFORE, for all of the reasons stated above, the Defendants, BARBARA CARGILL, STEVEN DEARING, CLINTON DUBOIS and LESTER TROWBRIDGE, pray that this Court enter summary judgment in favor of each of them and against Plaintiff for all pending claims against them.

RESPECTFULLY SUBMITTED,

BARBARA CARGILL, STEVEN DEARING,
CLINTON DUBOIS and LESTER
TROWBRIDGE,
Defendants

KEVIN W. LYONS,
State's Attorney of Peoria County

**s/ Melinda L. Mannlein**
Melinda Attorney Bar Number: 6288382
Attorney for Defendants
Peoria County Courthouse
324 Main Street, Room 111
Peoria, Illinois 61602
Telephone: (309) 672-6017
Fax: (309) 495-4914
E-mail: mmannlein@peoriacounty.org

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| NICOLE DAVIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-CV-1118 |
| | ) | |
| PEORIA COUNTY, et al., | ) | |
| Defendants | ) | |

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1**

This Motion complies with the type-volume limitation of Local Rule 7.1 because this Motion contains 6,971 words and 42,404 characters, excluding the parts of the Motion exempted by Local Rule 7.1(D)(5).

**s/ Melinda L. Mannlein**
*Attorney for Defendants*
Melinda Attorney Bar Number: 6288382
Peoria County Courthouse
324 Main Street, Room 111
Peoria, Illinois 61602
Telephone: (309) 672-6017
Fax: (309) 495-4914
E-mail: mmannlein@peoriacounty.org

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| NICOLE DAVIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-CV-1118 |
| | ) | |
| PEORIA COUNTY, et al., | ) | |
| Defendants | ) | |

**CERTIFICATE OF SERVICE**

I, MELINDA L. MANNLEIN, Assistant State's Attorney of Peoria County, hereby certify that on the 29th day of May, 2009, I caused a true and correct copy of the attached Defendants Cargill, Dearing, DuBois and Trowbridge's Motion for Summary Judgment to be served upon Plaintiff's attorneys by electronic notice.

**s/ Melinda L. Mannlein**
*Attorney for Defendants*
Melinda Attorney Bar Number: 6288382
Peoria County Courthouse
324 Main Street, Room 111
Peoria, Illinois 61602
Telephone: (309) 672-6017
Fax: (309) 495-4914
E-mail: mmannlein@peoriacounty.org